CLASSIC FOODS INTERNATIONAL
CORPORATION dba Classic
Foods, Inc., Plaintiff,

v.

KETTLE FOODS, INC., Defendant.

No. SACV 04–725 CJC (Ex).

United States District Court,
C.D. California,
Southern Division.

Jan. 3, 2007.

Colin Foley, Kathleen E. McCarthy, Siegrun D. Kane, Morgan and Finnegan, New York, NY, Craig S. Summers, Knobbe Martens Olson & Bear, Irvine, CA, for Plaintiff.

Arnold E. sklar, Ernest E. Price, Ropers Majeski Kohn and Bentley, Los Angeles, CA, for Defendant.

## MEMORANDUM OF DECISION

CORMAC J. CARNEY, District Judge.

## I. INTRODUCTION

This trademark case involves the use of the term "kettle" on packages of potato chips. Many snack food companies produce brands of potato chips with "kettle" in their names, including Plaintiff Classic Foods International Corporation ("CFI"), which makes "Kettle Classics," and Defendant Kettle Foods, Inc. ("KFI"), which makes "Kettle Chips." These two companies make their style of potato chips in much the same way as other producers. They slice small batches of potatoes directly into industrial-sized kettles or troughlike metal fryers, where they are stirred and cooked by hand. This kettle-cooking (or batch-cooking) process requires careful, individual attention to the chips to ensure that the proper flavor and crunch are produced without burning the chips. The result of this careful preparation and cooking process is a crunchier, sweeter potato chip that is of much higher quality than an ordinary, mass-produced chip.

In this lawsuit, KFI contends that it has trademark rights in the term "kettle" and that CFI must stop using the term in its brand name. The critical question before the Court is whether the term "kettle" is a trademark when used with potato chips. The Court concludes that the term "kettle" is not a protectible trademark. It refers to a particular category of potato chips, specifically, kettle chips. Consequently, the term "kettle" is generic when used with potato chips and it must be available for use by the marketplace and the public at large. KFI has no right to deny CFI and other producers of kettle chips from using the term "kettle" to tell consumers

exactly what their potato chips are.[1]

## II. FACTUAL BACKGROUND

According to culinary legend, the potato chip was created in Saratoga Springs, New York, in 1853. *See* Exh. 525 at 1, Exh. 609 at 123. Railroad magnate Cornelius Vanderbilt complained that the fried potatoes he had been served were "too thick," and sent them back to the kitchen. *Id.* Offended by the criticism, Chef George Crum sliced the next potato extra-thin into a kettle of oil, fried the slices crisp, and sent them back out to the table. *Id.* Mr. Vanderbilt approved, and a snack food legend was born. *Id.*

Much has changed since Chef Crum prepared the first potato chips over one hundred fifty years ago. As potato chip production expanded and chips became more popular, companies drifted away from the original kettle-cooking method to continuous frying processes more conducive to mass production. The continuous frying method soon became industry standard, and potato chips produced by that method flooded the market. Potato chip production is now a $5 billion dollar-a-year industry. Hundreds of companies currently make potato chips (and hundreds more have come and gone) in flavors ranging from traditional flavors such as original, and sour cream and onion, to exotic flavors like spicy Thai, and Cholula. Potato chips are now not only fried, but also baked, and even "fabricated" (made from a dough of dehydrated potato flakes).

Thirty years ago, several companies "rediscovered" the original method of making potato chips. These companies developed ways to adapt the original kettle-cooking (or batch-cooking, as it is also known) process to allow for larger scale production and distribution without sacrificing the distinctive quality and characteristics that resulted from hand-cooking potato slices in a vat or kettle of oil. The kettle-cooking process involves potato slices being fed directly into a vat of hot oil. Cameron Healy Tr. vol. 1, 44:23–25.[2] Once in the vat, they are stirred by an individual with a tool, often called a paddle or rake. Healy Tr. vol. 1, 44:25–45:1; Timothy Meyer Tr. vol. 4, 81:20–22. This individual is responsible for monitoring the temperature of the oil in the vat and determining when the chips are sufficiently cooked. Healy Tr. vol. 1, 45:1–2. Temperature control is one of the trickier parts of the batch-cooking process, because when the cold slices of potato are introduced into the oil, the temperature drops dramatically. Florencio Cuetara Tr. vol. 5, 227:5–12. Controlling how much the temperature drops and how quickly it is brought back up determines the crunchiness of the chip. Meyer Tr. vol. 4, 80:17–18; Cuetara Tr. vol. 5, 227:8–12. Once the chips are done, they are removed from the oil, either manually or mechanically, and sent to be seasoned, inspected, and finally packaged. Healy Tr. vol. 1, 45:2–4. The final product has a hand-cooked appearance, is crunchy and sweet, and superior to an ordinary potato chip.

One of the first companies to make potato chips using the batch-cooking process was a company in Pennsylvania called Martin's. Martin's was also the first company to use the term "kettle" on its packaging. In the mid–1970s, Martin's marketed its chips as "Martin's Kettle–Cook'd Hand Cooked Potato Chips." Kenneth Potter Dep. 27:14–16, 29:10–11; Exh. 548.

---

1. This Memorandum of Decision constitutes the Court's findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52.

2. Trial testimony is cited as "[witness name] Tr. vol. # , pg. # : line # ." The volume number reflects the day of the trial on which the witness testified.

In 1980, another company, the Cape Cod Potato Chip Company ("Cape Cod") in Massachusetts, also began producing a kettle-cooked potato chip. Steve Bernard Dep. 19:4–5, 21:15–18. Cape Cod marketed its product as "Old Fashioned Kettle Cooked Cape Cod Potato Chips." Exh. 228. Throughout the 1980s and 1990s, many other companies made potato chips using a kettle-cooking process that used the word "kettle" in their product names. Companies such as Granny Goose, Herr's, Utz, Poore Brothers, Groff's, Borden, Frito–Lay, Eagle Foods, Old Dutch, Saguaro, Tim's, and Pacific Snax all offered potato chip products that described themselves as "kettle," "kettle-cooked," or "kettle-style" prior to 1999. *See* Exh. 629 at 9–16; Cuetara Tr. vol. 5, 144:12–150:11; Meyer Tr. vol. 4, 41:10–53:14.

KFI was also one of the first companies to use the batch-cooking process to make potato chips and to use the term "kettle" in its product name. KFI, at the time known as the N.S. Khalsa Company,[3] first began selling its "Kettle Chips" product in 1982. Healy Tr. vol. 1, 42:1. Cameron Healy,[4] the founder of KFI, was inspired to start manufacturing his "Kettle Chips" by newspaper articles describing a company in Maui that was making hand cooked potato chips. Healy Tr. vol. 1, 42:20–43:10. Mr. Healy learned that these potato chips were made using a similar batch process to the kind KFI was already using to roast nuts. Healy Tr. vol. 1, 43:14–17. Through discussions with the proprietor of the Maui company, Mr. Healy learned how to adapt the batch process to potato chips. Healy

Tr. vol. 1, 43:14–17. He made his first bag of chips in 1982 using the batch process, and KFI continues to use that process to manufacture its chips today.

KFI has associated "Kettle Chips" with kettle-cooking imagery. Throughout the 1980s, "Kettle Chips" packages stated, "Kettle chips are a delicious, all natural, gourmet quality potato chip produced in much the same way as in a previous era when potato chips were prepared by the batch and **cooked in a giant gas-fired pot or kettle.**" Exh. 125 at 2 (emphasis added). For nearly twenty-five years, the image on the front of the "Kettle Chips" bag depicted one man carrying in sacks of potatoes while another is stirring a steaming kettle over an open fire. Exh. 125 at 1. And an advertisement that ran in *Sunset Magazine* described the "Kettle Chips" cooking process as "the lost art of potato chip making.... We slice select Oregon Russet potatoes directly into **simmering kettles.**" Exh. 104 (emphasis added).

KFI initially obtained federal trademark registration for the mark "Kettle Chips" in 1984. Exh. 71. However, in 1990 the Patent and Trademark Office ("PTO") cancelled KFI's registration because their affidavit submitted pursuant to Section 8 of the Trademark Act failed to set forth "the goods or services recited in the registration on or in connection with which the mark is in use in commerce." Exh. 72 at 1. Although KFI appealed this cancellation, the decision was affirmed, and KFI's mark was officially cancelled as of June 5, 1991. Exh. 72 at 2. Since that time, KFI has submitted several applications to at-

---

**3.** The N.S. Khalsa Company actually began its existence as Northwest Cheese Express. Healy Tr. vol. 1, 38:25. The company changed its name to the N.S. Khalsa Company in 1981, and then to Kettle Foods, Inc. in 1988. Healy Tr. vol. 1, 39:1–8. For ease of identification, it will be referred to exclusively as KFI throughout this memorandum.

**4.** From 1973 to 1995, Mr. Healy was known by his spiritual name, Nirbhao Singh Khalsa. Healy Tr. vol. 1, 38:10–16. For ease of identification, he will be referred to exclusively as Mr. Healy throughout this memorandum.

tempt to register "Kettle," "Kettle Chips," and "Original Kettle Chips." Exhs. 242, 638, 640, 643–47. Many of these applications were opposed by other companies in the potato chip industry who sold potato chip products that use the term "kettle" on their packaging. *See* Exhs. 531, 632, 655. KFI abandoned certain applications pursuant to settlement agreements it had reached with companies who had filed oppositions. *See* Exh. 75. Other applications were refused by the PTO because the term "Kettle" as used on potato chips was not sufficiently distinctive to qualify for trademark registration. *See* Exhs. 505, 640. In one such refusal, the PTO stated:

> Where terms are so highly descriptive of the goods to be incapable of denoting origin in any one party in the trade, they are determined to be "generic" marks and unregistrable. **The term "kettle chips" falls into this category.**

Exh. 505 at 2 (refusing registration for "Original Kettle Chips") (emphasis added).

Despite losing its trademark registration, KFI continued to sell its products as "Kettle Chips" and has established itself as a major player in the retail potato chip market. By its own accounting, KFI's potato chip products command 34% of the market for natural potato chips in mainstream grocery stores and 49% of the market in natural food stores. Bruce Bechtel Tr. vol. 3, 42:16–43:3; Exh. 130 at 4.[5] KFI sells "Kettle Chips" in all fifty states. Healy Tr. vol. 2, 18:19–21. "Kettle Chips" have also earned accolades from various publications, such as *Health Magazine* awarding its Best Chip of 2005 Award to

"Organic Kettle Chips Chipotle Chili Barbeque Flavor." Exh. 142 at 2–3.

CFI's entry into the potato chip industry was later and more complicated than that of KFI. In the early years of the kettle chip, many of the companies that first pioneered this method of production were eager to give aid and assistance to other prospective chip makers. Potter Dep. 40:2–5, 12–20, 60:7–14; Bernard Dep. 21:6–18, 25:19–26:5. They wanted to promote what they viewed as a superior method of making potato chips, and were hopeful that it would realize widespread success. Bernard Dep. 26:22–27:7. Among the beneficiaries of this open collaboration in the kettle chip industry were the predecessors to CFI. In 1984, Robert Storey entered into a west coast distribution agreement with Groff's, a potato chip company operating out of Pennsylvania. Robert Storey Dep. 11:9–14:8. Initially, Mr. Storey sold product made in Pennsylvania by Groff's under the name "Groff's Kettle Chips." Storey Dep. 15:1. Before long, Mr. Storey had arranged for a west coast entity, Crispy Snacks, to manufacture kettle chips for distribution under his newly incorporated company, Pacific Snax. Storey Dep. 19:2–23, 21:23–22:10; Cuetara Tr. vol. 5, 119:7, 123:24–124:1. Mr. Storey marketed his new product under the name "Pacific Snax Kettle Classics Style Potato Chips." Exh. 1.[6]

Crispy Snacks was run by Florencio Cuetara and others in the Cuetara family. In the 1980s, when they entered into a production agreement with Pacific Snax, Crispy Snacks' only involvement with ket-

---

**5.** These numbers are based on data collected by AC Nielsen and Spinscan, third party market research companies that track sales information from grocery stores. Bechtel Tr. vol. 3, 40:21–41:1; Exh. 130 at 4.

**6.** The "Kettle Classics" moniker was actually first used with Groff's packaging. Storey

Dep. 22:1–9. Horace Groff, owner of Groff's, allowed Mr. Storey to use the Groff's name while Pacific Snax and "Kettle Classics" got established, with the understanding that such use would only be temporary. Storey Dep. 22:6–9.

tle-style chips was as a co-packer. Storey Dep. 19:11–13. In order to produce and package the "Pacific Snax Kettle Classics" chips, Crispy Snacks was required to update its equipment and purchase a kettle, or batch fryer, so that the chips would be properly made. Storey Dep. 19:18–23; Cuetara Tr. vol. 5, 124:5–8. When Crispy Snacks first started making kettle chips, the plant manager from Groff's consulted with Crispy Snacks for a month to help them learn and master the kettle process. Cuetara Tr. vol. 5, 124:19–126:3. As part of the initial co-packing agreement, and in exchange for Crispy Snacks investing in the necessary kettle fryers and packaging machines, Crispy Snacks obtained the rights to the "Kettle Classics" mark. Storey Dep. 23:14–22; Cuetara Tr. vol. 5, 133:21–25. This arrangement between Pacific Snax and Crispy Snacks continued until 1992, when the Cuetara family, in a partnership with other entities, purchased Pacific Snax outright. Storey Dep. 22:25–23:5; Cuetara Tr. vol. 5, 134:24–135:3.[7] Pacific Snax sold its product as "Kettle Classics Style" until 1994, and then removed "Style" in 1994, such that its product was "Pacific Snax Kettle Classics Potato Chips." Exh. 1.

When Pacific Snax went out of business, Mr. Cuetara decided that he wanted to continue manufacturing the "Kettle Classics" product. Cuetara Tr. vol. 5, 150:24–151:1. Accordingly, he incorporated a new company, CFI. Cuetara Tr. vol. 5, 151:8–16.[8] When CFI started marketing "Kettle Classics" under its own label, it redesigned the package and altered the name of the product. The product is now simply "Kettle Classics Potato Chips," and the new bag is stamped with a "C f i" watermark that appears in several places on the bag, designating CFI as the manufacturer of the product. Exh. 680; Cuetara Tr. vol. 5, 151:17–152:19.

CFI engages in nationwide distribution of its kettle-style potato chips. It has limited its retail presence primarily to the "big box" club stores, such as Sam's and Price Club. Cuetara Tr. vol. 5, 157:9–12. CFI's primary market is the food service industry. It has contracts with restaurants such as Noah's Bagels and Bruegger's Bagels, and with almost every major airline except Southwest Airlines, to feature "Kettle Classics" on their menus. Cuetara Tr. vol. 5, 157:7–17, 24; Meyer Tr. vol. 4, 135:19–21; Exh. 27. Through its retail presence and (primarily) its food service accounts, CFI distributes "Kettle Classics" to all fifty states. Cuetara Tr. vol. 5, 171:9–12. CFI has also garnered accolades for its "Kettle Classics" product, such as a finalist's award for the 2002 Best Snack in the Western Hemisphere at the Americas Food and Beverage Trade Show & Conference held in Miami, Florida. Exh. 606 at 2.

This lawsuit arises from CFI's use of the term "kettle" in its "Kettle Classics" brand name. KFI first challenged CFI's use in this regard in 2002 during an international trade show in Paris. KFI claimed that CFI's "Kettle Classics" infringed KFI's European trademark for "Kettle Chips," and attempted to have CFI evicted from the trade show. Cuetara Tr. vol. 5, 222:25–223:2. Shortly thereafter, KFI sued CFI for infringement in a French court. Cuetara Tr. vol. 5, 223:4–6. KFI

---

7. Crispy Snacks was not the entity that purchased Pacific Snax; instead, it was another company owned by the Cuetaras. Cuetara Tr. vol. 5, 136:9–137:3. It was not until 1994 that Crispy Snacks merged into Pacific Snax. Cuetara Tr. vol. 5, 138:6–13.

8. This company was briefly known as Slender Light before CFI was formally established. Cuetara Tr. vol. 5, 151:6–8.

also opposed CFI's application for federal registration of "Kettle Classics" as a trademark in 2003. Cuetara Tr. vol. 5, 224:6–7. Having encountered repeated opposition from KFI to the use of the name "Kettle Classics," CFI filed this lawsuit seeking declaratory relief that their product is not infringing. KFI counterclaimed, accusing CFI of trademark infringement.

In its counterclaim, KFI seeks trademark protection for the term "kettle" as used on its "Kettle Chips" product. KFI alleges that "kettle" as used on potato chips is descriptive of the goods, rather than generic. Accordingly, KFI alleges that the mark is eligible for protection because "kettle" has taken on a secondary meaning in the minds of consumers such that they associate it primarily with "Kettle Chips." CFI, on the other hand, contends that KFI has no trademark rights with respect to the term "kettle." CFI contends that "kettle" is a generic term that consumers do not associate with any one source, and that "kettle" is thus available for use by all producers of kettle chips.[9] The Court conducted a seven day bench trial to resolve the trademark issues in dispute between the parties.

## III. LEGAL ANALYSIS

### A. Genericness of "Kettle" and "Kettle Chips"

The trademark laws have three primary goals: (1) protecting the public from being misled or confused about the nature and source of goods; (2) protecting the rights of a business to identify itself to the public and to protect its reputation in offering goods to the public; and (3) achieving the first two goals in a manner consistent with fair and free competition. *Intel Corp. v. Terabyte Int'l, Inc.,* 6 F.3d 614, 618 (9th Cir.1993). These goals, however, are often conflicting. The way the trademark laws balance the three goals is to provide protection only to marks that are truly distinctive. A prospective trademark is therefore placed in one of five categories, depending on its distinctiveness: (1) fanciful; (2) arbitrary; (3) suggestive; (4) descriptive; and (5) generic. *Yellow Cab Co. of Sacramento v. Yellow Cab of Elk Grove, Inc.,* 419 F.3d 925, 927 (9th Cir.2005) (*quoting KP Permanent Make–Up, Inc. v. Lasting Impression I, Inc.,* 408 F.3d 596, 602 (9th Cir.2005)).

9. KFI argues that CFI should be barred by the doctrine of judicial estoppel from asserting genericness as a defense. KFI bases its judicial estoppel argument on a statement made by Mr. Cuetara to the PTO in connection with the application for registration of "Kettle Classics" as a mark. In response to an office action by the PTO, Mr. Cuetara amended his application, using language suggested by the examiner, to state that the " 'KETTLE' portion of the mark has become distinctive of the goods through the applicant's substantially exclusive and continuous use in commerce for at least five years immediately before the date of this statement." Exh. 14 at 24, 25. The mark was published for opposition under this application in 2003, but never approved for registration. On August 30, 2004, Mr. Cuetara made another amendment to his application, this time disclaiming "the exclusive right to use the word

KETTLE apart from the mark as shown." Exh. 15 at 1. KFI argues that Mr. Cuetara's statement that "KETTLE" had become distinctive of CFI's "Kettle Classics" should estop CFI from asserting genericness as a defense to infringement here. For a prior statement to result in judicial estoppel, it must have been actually adopted by the court or agency in the prior proceeding, and the declarant must have received a favorable result from his statement. *See Rissetto v. Plumbers & Steamfitters Local 343,* 94 F.3d 597, 600–01 (9th Cir.1996). Here, Mr. Cuetara's position did not ultimately result in a favorable outcome for CFI, as no registration was approved on the basis of his statement. Thus, the PTO did not rely on the statement of Mr. Cuetara to award CFI any material benefit. Accordingly, judicial estoppel is not applicable here.

Suggestive, arbitrary, and fanciful marks receive automatic protection because they serve to identify a particular product's source, as opposed to describing the product itself. *Id.* (*quoting KP Permanent Make–Up*, 408 F.3d at 602). Descriptive marks directly define an attribute of the product in a way that does not require any leap of the imagination. *Id.* Such marks receive trademark protection only if they have acquired distinctiveness by establishing secondary meaning in the marketplace. *See Filipino Yellow Pages, Inc. v. Asian Journal Publ'ns, Inc.*, 198 F.3d 1143, 1147 (9th Cir.1999).

Generic marks receive no trademark protection, even with a showing of secondary meaning, because they merely identify what a product is. *Yellow Cab,* 419 F.3d at 927. Rather than identifying a product's source, generic terms "give the general name of the product; they embrace an entire class of products." *Kendall–Jackson Winery, Ltd. v. E. & J. Gallo,* 150 F.3d 1042, 1047 n. 8 (9th Cir.1998). A generic term "is one that refers, or has come to be understood as referring, to the genus of which the particular product or service is a species." *Filipino Yellow Pages,* 198 F.3d at 1147 (*quoting Surgicenters of America, Inc. v. Med. Dental Surgeries Co.,* 601 F.2d 1011, 1014 (9th Cir. 1979)).

Generic terms are part of the public domain and free for all producers to use. *See* 2 J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 12:2 (4th ed. 2006) ("2 MCCARTHY"). "The word having become part of the public domain, it would be unfair to unduly restrict the right of a competitor ... to use the word." *King–Seeley Thermos Co. v. Aladdin Indus., Inc.,* 321 F.2d 577, 581

(2d Cir.1963). Providing protection to a generic term would frustrate, rather than further, the goals of trademark law. A generic term by definition performs no source-identifying function; it does not tell consumers who made the product. *See KP Permanent Make–Up,* 408 F.3d at 602 (*citing Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.,* 469 U.S. 189, 194, 105 S.Ct. 658, 83 L.Ed.2d 582 (1985)). Instead, granting one company exclusive rights to use a generic term would actually deny vital product information to consumers, because a competing company would be deprived of the ability to name its product what it is. *See CES Publ'g Corp. v. St. Regis Publ'ns,* 531 F.2d 11, 13 (2d Cir.1975); *see also Blau Plumbing, Inc. v. S.O.S. Fix–It, Inc.,* 781 F.2d 604, 609 (7th Cir.1986) ("Imagine being forbidden to describe a Chevrolet as a 'car' or an 'automobile' because Ford or Chrysler or Volvo had trademarked these generic words....").

The critical issue in this case is whether the terms "kettle" and "kettle chips" as used on potato chips are generic or descriptive. In determining whether a term is descriptive or generic, courts in the Ninth Circuit rely on the "Who are you?/What are you?" test. *Filipino Yellow Pages.* 198 F.3d at 1147. "A mark answers the buyer's questions 'Who are you?' 'Where do you come from?' 'Who vouches for you?' But the [generic] name of the product answers the question 'What are you?'" *Official Airline Guides, Inc. v. Goss,* 6 F.3d 1385, 1391 (9th Cir.1993). Under this test, if the primary significance of the mark is to identify the type of product, rather than the producer, the mark is a generic term and cannot be a valid trademark. *Filipino Yellow Pages,* 198 F.3d at 1147.[10]

---

10. Competitors "may use a term that was once distinctive if it has become generic over time." *Yellow Cab,* 419 F.3d at 928. The crucial date for the determination of generic-

Federal courts rely on several sources to determine whether a term answers the question "What are you?" and is generic. For example, federal courts view usage of a particular term in the popular press as strong evidence of how the public perceives that term. *Murphy Door Bed Co. v. Interior Sleep Sys., Inc.*, 874 F.2d 95, 101 (2d Cir.1989) ("*Murphy Bed*"). The media is often considered to have its finger on the pulse of the general public, and its use of a particular term will likely conform to the public's understanding of that term. The press also has the ability to shape public interpretation. If consumers repeatedly encounter a term used generically in the media, they will be much more likely to use the term generically themselves.

Evidence of generic media usage led to the holding that the term "Murphy bed" was generic in *Murphy Bed*. The plaintiff had been manufacturing Murphy beds, a bed that could be lowered from or raised into a wall, since 1918. *Id.* at 98. It had continuously used the term "Murphy bed" as a trademark for its product since at least 1925. *Id.* Moreover, the plaintiff's presence on the market had been substantially exclusive from 1918 until 1986, when the defendant in the action began advertising and selling its own Murphy beds. *Id.* Nonetheless, the Second Circuit concluded that the term "Murphy bed" had, over the years, become generic for a type of bed that folded into a wall. *Id.* at 97. The *Murphy Bed* court relied in part on "numerous examples of newspaper and magazine use of the phrase Murphy bed to describe generally a type of bed." *Id.* at 101. The court noted that "such evidence is not proof positive, but it is a strong indication of the general public's percep-

tion that Murphy bed connotes something other than a bed manufactured by the Murphy Co." *Id.*

Similarly, the Ninth Circuit in *Surgicenters* relied on extensive media evidence to hold that the term "Surgicenter" was generic. *Surgicenters*, 601 F.2d at 1013, 1017. The plaintiff opened a facility for one-day and outpatient surgical care in Phoenix, Arizona, and obtained a registered trademark for its "Surgicenter" name. *Id.* at 1012. The plaintiff also licensed use of the mark to different facilities in several states. *Id.* However, in 1975, the defendant renamed its Oregon facilities "Medical Dental Surgicenters" without obtaining a license, and the plaintiff sued to enjoin its use. *Id.* The Ninth Circuit found that "Surgicenter" was a generic name, noting that there was "nothing in the record to indicate that any potential consumer considered the term 'Surgicenter' to mean anything other than a surgical center." *Id.* at 1017. Among the exhibits in support of this conclusion were "magazine and medical journal articles, letters and a television transcript" all using the term "Surgicenter" in a generic sense. *Id.* at 1013.

As in *Murphy Bed* and *Surgicenters*, the media evidence in this case provides strong indication of the general public's perception that "kettle chips" connotes something other than potato chips manufactured by KFI. CFI presented 37 articles from such prominent publications as the *New York Times*, the *Los Angeles Times*, and *Consumer Reports*. *See* Exh. 531 at 3–7; Exh. 525; Exh. 609 at 1–203. These articles all use the terms "kettle" and "kettle chips" to refer to a general type of potato chip or a segment in the

---

ness in this case is 1999, the date CFI first entered the market with the disputed mark. *See Nora Beverages, Inc. v. Perrier Group of Am., Inc.*, 164 F.3d 736, 744 (2d Cir.1998). If

"kettle" had become generic by 1999, or at any time prior, it is not a valid, protectible mark.

potato chip industry, rather than to KFI's product specifically. By 1991, *Snack Food Magazine* had identified a "kettle-style potato chip segment" of the chip industry that was responsible for $364 million in nationwide sales. Exh. 531 at 7. In June of 1991, *Consumer Reports* described kettle chips as a "subspecies" of potato chips, and listed it along with "regular chips" and "fabricated chips" as one of only three types of chips in the entire industry. Exh. 525 at 1–2. Moreover, the articles recognize that there were several companies producing kettle chips and competing in the kettle chip segment of the industry. For instance, an article from the *New York Times* reported:

> [T]here is one clear trend in the industry: the rise of the so-called kettle chip, a thicker variety that has harder bite, or crunchiness, and more concentrated flavor. . . . **Even among the kettle chips, there is an abundance of regional varieties.**

Exh. 609 at 123 (emphasis added).[11]

In addition to using the term generically to identify a type of product, several news articles use the term "kettle" to identify the cooking process itself. For example, one *New York Times* article described the cooking process as "slicing potatoes into a kettle of oil and frying until they were crisp." Exh. 609 at 4. Another *New York Times* article notes that the container in which kettle chips are cooked "is called a kettle, but it looks more like a trough." Exh. 609 at 190.

The extensive newspaper and magazine usage illustrates that "kettle" and "kettle chips" are terms used to tell the public what the general product is, not who makes it. The media does not use "kettle" or "kettle chips" to identify a particular producer, but rather to denote a type of potato chips that is made by several producers in the industry. And in those media articles using "kettle" to describe the cooking process, the media is telling consumers what a kettle chip is: a potato chip cooked in a kettle.[12]

■ Federal courts also view usage of the term by competitors in the industry as strong evidence of how the public perceives the term. The more members of the public see a term used by competitors in the field, the less likely they will be to identify the term with one particular producer. Evidence of competitor usage was considered by the Eighth Circuit in *Schwan's IP, LLC v. Kraft Pizza Co.*, 460 F.3d 971 (8th Cir.2006). That case involved an infringement action over the term "brick oven pizza." *Schwan's IP*, 460 F.3d at 972. The plaintiff made a frozen pizza that "appears to have been baked in a brick wood fired oven." *Id.* at 973 (internal quotation omitted). When it first introduced its Freschetta Brick Oven pizza in 2003, it was the only seller on the market, but within a few months, a handful of other companies had developed their own "Brick Oven" frozen pizzas. *Id.* The Eighth Circuit concluded that "Brick Oven, as used to identify pizza, is a generic term." *Id.* at 975. The court cited the presence of four other companies in the frozen pizza industry, including the defendant, that had sold or were selling Brick Oven pizzas. *Id.* The court found that all these competitors used the term similarly,

---

**11.** Several other articles submitted by CFI either refer to the large number of kettle chip companies in the industry, or profile different individual manufacturers of kettle chips in several different parts of the country.

**12.** CFI's linguistics expert, Dr. Ronald Butters, also conducted a survey of media usage of "kettle" and "kettle chips" and concluded that their overwhelming usage was generic. Ronald Butters Tr. vol. 5, 69:6–7; Exh. 69 at 20–23.

to identify a pizza that had been or appeared to have been baked in a brick oven. *Id.*

In *Schwan's IP*, the presence of four other producers who called their pizza "brick oven" or "brick oven style" was persuasive evidence showing that "brick oven" had become generic for a type of pizza. Here, CFI submitted evidence of at least *fifteen* companies, including the parties, who sold kettle chip products prior to 1999. Companies including Martin's, Cape Cod, Granny Goose, Herr's, Utz, Poore Brothers, Groff's, Borden, Frito–Lay, Eagle Foods, Old Dutch, Saguaro, Tim's, and Pacific Snax all had products on the market that used the terms "kettle," "kettle-style," or "kettle-cooked." *See* Exh. 629 at 9–16; Cuetara Tr. vol. 5, 144:12–150:11; Meyer Tr. vol. 4, 41:10–53:14.[13]

Many of the competitors on the market using "kettle" and related terms in their product names also use those terms to define their cooking processes. For example, Eagle Foods Hawaiian Kettle Extra Crunchy Potato Chips are prepared by a "special slow-cook kettle process." Exh. 531 at 11–12. Poore Brothers Kettle Cooked Olde English Salt & Vinegar Potato Crisps are "hand kettle cook[ed] in batches like mother does on her kitchen stove." Exh. 531 at 15–16. And Old Fashioned Kettle–Cooked Cape Cod Potato Chips are the product of a "special kettle cooking process." Exh. 531 at 21–22. Even KFI's own packaging linked "kettle" with the cooking process. From the first "Kettle Chips" batch produced in the early 1980s through at least March of 1990, the back of the bag included a description of the cooking process:

> [P]roduced much the same way as in a previous era when potato chips were prepared by the batch and **cooked in a giant gas-fired pot or kettle.**

Exh. 125 at 2; Exh. 127 at 2 (emphasis added). When consumers see "kettle" linked directly to the cooking process by several companies, they are informed that a kettle chip is a potato chip that has, or appears to have been, cooked in a kettle. Again, the term "kettle" does not help identify the source of the product, because many different producers advertise their cooking process as kettle cooking.

Numerous competitors also describe taste and texture characteristics that are similar for all kettle chips. For example, the Poore Brothers package states that the "batch cooking and special temperature profile ... gives our chips the extra crunch, real potato taste, and just a hint of sweetness." Exh. 531 at 16.[14] Eagle Foods' bags claim that their "slow-cook kettle process" resulted in "[e]xtra crunchy texture" and "[t]ruer potato flavor." Exh. 531 at 12. Many other products on the market prior to 1999 conveyed the "crunchy" characteristics of their chips

---

**13.** Among the products made by these companies are Kettle Cooked Chippers Potato Chips (by Granny Goose, in six flavors), Poore Brothers Kettle Cooked Potato Crisps (in three flavors), Utz Kettle Classics Crunchy Potato Chips (in four flavors), Groff's Kettle Cooked Potato Chips Natural Unsalted (and four other flavors), Krunchers Kettle Cooked Potato Chip (by Borden, in nine flavors), Lay's Crunch Tators Potato Chip Kettle Cooked (in seven flavors), Martin's Kettle Cook'd Hand Cooked Potato Chips (in three flavors), Old Dutch Dutch Crunch Potato Chip Kettle Cooked (in four flavors). Exh. 629 at 9–16.

**14.** Mr. Meyer, Mr. Butters, and Mr. Cuetara also identified sweetness as characteristic of kettle chips during trial. Meyer Tr. vol. 4, 80:5–13 (noting the "high levels of natural sugars" in the potatoes used in "Kettle Chips"); Butters Tr. vol. 5, 86:25–87:2 (describing crunchiness, thickness, and sweetness as "semantic features" denoted by the term "kettle chips"); Cuetara Tr. vol. 5, 227:14–15.

through the product's name itself, such as Utz Kettle Classics Crunchy Potato Chips, Lay's Crunch Tators Potato Chips Kettle Cooked, and Krunchers Kettle Cooked Potato Chips.

The cumulative effect of the extensive generic use of "kettle" by competitors is that consumers learn that "kettle" refers to a type of potato chip, and not any particular producer. Consumers see dozens of products on the marketplace identified as "kettle chips," "kettle-cooked chips," or "kettle-style chips." Through descriptions of the kettle cooking process on the back of the bag, consumers also learn that kettle chips are chips that have been, or appear to have been, made in a kettle and that kettle chips are crunchier and sweeter than the ordinary potato chip.

■ Finally, the opinions of leaders in the industry are particularly helpful to federal courts in determining the genericness of a term. 2 McCarthy § 12:13. In this regard, CFI presented the testimony of Ken Potter of Martin's and Steve Bernard of Cape Cod, two prominent and respected leaders in the potato chip industry. Martin's and Cape Cod were among the founding companies of the kettle chip rebirth in the late 1970s and early 1980s. Mr. Bernard is the founder of Cape Cod, and Mr. Potter, Martin's current president, was a Martin's employee when its first kettle chips were produced. Bernard Dep. 15:16–19; Potter Dep. 15:6–13. As some of the first producers on the market, Martin's and Cape Cod helped define the new type of potato chip that they were producing. Since the beginning, both companies have used the term "kettle" in connection with their chips. Moreover, both Mr. Bernard and Mr. Potter consider their chips to be within the broad category of chips that the industry calls kettle chips.

Both men describe their cookers interchangeably as "kettles" and "fryers," refer to the cooking method as a "kettle process," and define their products as "kettle chips." Bernard Dep. 21:6–18; Martin Dep. 35:9–37:8. Mr. Potter testified that Martin's prepares its chips using "a batch process in an open kettle." Potter Dep. 29:10–11. He also testified that he used the term "kettle" and "fryer" interchangeably to describe the metal vat in which the chips were cooked. Potter Dep. 35:9–36:10. Mr. Potter stated:

> If somebody says, kettle chips, I don't think of any one brand unless they're talking to me about Martin's. . . . But **if they're talking about potato chips in general and they say, kettle chips, it just tells me it's some kind of hand-cooked—it's an area—it's a type [of] chip, not a—not anybody's brand.**

Potter Dep. 59:13–21 (emphasis added). Mr. Potter recognized a kettle chip as a type of potato chip that was "harder and curly and ha[d] more of a bite to it." Potter Dep. 43:1–9.

Mr. Bernard's testimony reveals a similar understanding of the term "kettle" at Cape Cod. He recalls referring to his initial fryers as "kettles," noting "it was kind of accepted practice by everybody; that's what we referred to them as." Bernard Dep. 38:10–15. In fact, Mr. Bernard stated that he could identify whether a particular potato chip was a kettle chip purely by taste. "I knew after trying the product what it was . . . [b]ecause you can only get that bite from a kettle process." Bernard Dep. 49:17–21. Mr. Bernard went on to identify what it was about the kettle cooking process that gave all kettle chips that distinctive bite. "A kettle [chip]—a true kettle [chip] is sliced directly into the kettle . . . the temperature will go way down and then slowly come back up and it's that temperature curve that provides . . . that harder bite. And so anybody that's done it, that's the appeal of the process." Ber-

nard Dep. 50:5–13. Finally, when asked whether he viewed kettle chips as a category in the industry, Mr. Bernard responded:

**I've always thought of kettle chips as a category, yeah.**

Bernard Dep. 40:10–11.

The opinions of Mr. Potter and Mr. Bernard were confirmed by Chet Thomas, a long-time and very highly regarded employee of KFI. Mr. Thomas began working for KFI in 1982 and was responsible for packing some of the first packages of "Kettle Chips" ever sold. Chester Thomas Dep. 25:11–13, 26:7–8. During his twenty-five years with the company, Mr. Thomas has become familiar with the widespread use of "kettle" and "kettle-style" by competitors in the industry. During his deposition, Mr. Thomas explained how those terms are commonly used in the marketplace:

Q: And if competitors make reference to the term kettle-style or kettle-cooked, that may not be in reference to your company; it may be in reference to a style of potato chips?

A: **Unfortunately yes.**

Thomas Dep. 105:25–106:4 (emphasis added). Later in his deposition, Mr. Thomas compared "kettle" to Xerox and Kleenex, terms he felt were initially associated with just one company but had come to be used generically by the public to refer to all copiers or facial tissues, respectively. Thomas Dep. 106:4–19. When asked whether this same development had occurred with "kettle," Mr. Thomas said unequivocally: **"Yes."** Thomas Dep. 106:24 (emphasis added).

The testimony of these three industry leaders reveals that producers of potato chips recognize that there is a kettle chip segment of the potato chip industry. Producers in this segment call their cookers kettles, call their cooking method a kettle-cooking process, and refer to their products generically as kettle chips. All three men have been in the potato chip business at least twenty years, and through their experience in that business, they understand that when both consumers and other producers use the term "kettle," they are generally referring to a type, style, or category of potato chips.

In summary, the media, competitors, and industry leaders all use "kettle" and "kettle chips" as generic terms. They use the terms primarily to identify a particular genus of potato chip product—the kettle chip genus—rather than any particular producer within that genus. Stated more simply, they use the terms to tell consumers exactly what the potato chips are.

KFI nevertheless contends that "kettle" is a descriptive mark, not a generic one. KFI argues that its survey evidence shows that consumers view "kettle" as a brand name, and not a generic name. KFI's survey, conducted by Robert Reitter, found that 52% of the public viewed "kettle" as a brand name. Exh. 118 at 6; Robert Reitter Tr. vol. 5, 11:25–12:2. KFI's survey, however, has several flaws in its methodology. It uses a circular definition for what a brand name is, it fails to screen subjects to see if they understood what a brand is, and it fails to identify or account for any order bias that might have been produced. Exh. 118 at 10–11. Also, CFI introduced its own consumer survey, performed by Dr. Itamar Simonson, that produced essentially opposite results. Only 34.8% of those surveyed by Dr. Simonson thought "kettle" was a brand name. Exh. 84 at 11. In light of the foregoing, the survey evidence presented by KFI is essentially in equipoise with that offered by CFI, and is of only limited evidentiary value.

KFI also argues that the primary function of "kettle," "kettle chips," "kettle-cooked," and "kettle-style" is to describe the product, and so the terms must be descriptive, rather than generic. This type of argument has been made by plaintiffs in several different trademark cases, and has consistently been rejected by the courts. *See, e.g., Mil–Mar Shoe Co. v. Shonac Corp.*, 75 F.3d 1153, 1158 (7th Cir. 1996); *A.J. Canfield Co. v. Honickman*, 808 F.2d 291, 308 (3rd Cir.1986); *Miller Brewing Co. v. G. Heileman Brewing Co.*, 561 F.2d 75, 80 (7th Cir.1977). "[A]ssuming that any element of description within a mark automatically precludes that mark from being found to be generic is factually and legally inaccurate and opposed to the tradition and purposes of trademark law." *Mil–Mar Shoe*, 75 F.3d at 1157. · A generic designation is, in one sense, simply "the ultimate in descriptiveness" because it is necessary for producers to use that term to inform consumers about the nature and identity of their goods. 2 McCarthy § 12:20.

In *Mil–Mar Shoe*, the Seventh Circuit considered the eligibility of the name "Warehouse Shoes" for protection as a trademark on a shoe store. The plaintiff advanced the argument that because the name "effectively describe[d] what is sold and the type of store doing the selling," it must be deemed descriptive for purposes of a distinctiveness analysis. *Id.* at 1158. The court rejected this argument, finding that it "misunderstands and oversimplifies the inquiry at stake for trademark purposes." *Id.* Instead, the critical question is whether or not the term "signif[ied]" a particular type, category, or genus of retail

stores." *Id.* at 1161. The Seventh Circuit concluded that "Warehouse Shoes" simply signified the genus of "large stores that sell shoes in high volume at discount prices" and thus held the term to be generic. *Id.*

The facts of this case compel a similar conclusion to that reached in *Mil–Mar Shoe*. The evidence is overwhelming that the terms "kettle" and "kettle chips" refer to a particular type, category, or genus of potato chips. Kettle chips are chips that either have been, or appear to have been, cooked in a kettle. Moreover, consumers and producers alike have come to use the term "kettle chip" to describe a potato chip that is hand-cooked, crunchy in texture, and sweeter in flavor. Thus, any descriptive function performed by "kettle" or "kettle chips" describes attributes that are shared by all chips in the kettle chips category. The primary significance of the terms is to identify a type of potato chip, and therefore, they must be generic.

## B. Secondary Meaning of "Kettle" and "Kettle Chips"[15]

Marks that are "merely descriptive" of the goods they identify are generally not entitled to trademark protection. *See* 15 U.S.C. § 1052(e). However, if the plaintiff can show that a "secondary meaning" has attached to the mark, such that the consuming public connects the mark with the specific producer, the mark can be protected. *Surgicenters*, 601 F.2d at 1018. The "basic element" of secondary meaning is whether there is a "mental recognition in buyers' and potential buyers' minds that products connected with the [mark] emanate from or are associated with the same

---

**15.** Having concluded that "kettle" and "kettle chips" are generic, the issue of secondary meaning is technically irrelevant. *See Mil–Mar Shoe*, 75 F.3d at 1161–62. However, as the Court finds that "kettle" has not been strongly associated by consumers with "Kettle Chips" products alone, and thus lacks secondary meaning, it addresses the issue below as an alternative ground for finding that "Kettle" and "Kettle Chips" are not protectible marks.

source." *Levi Strauss & Co. v. Blue Bell, Inc.*, 632 F.2d 817, 820 (9th Cir.1980). Courts can only find secondary meaning if the descriptive term has become so associated with the product that it serves primarily as a designation of the source rather than of a characteristic of the product. *See Schwan's IP*, 460 F.3d at 974.

In *Flowers Industries Inc. v. Interstate Brands Corp.*, 5 U.S.P.Q.2d 1580 (T.T.A.B. 1987), the Trademark Trial and Appeal Board considered whether the applicant had established secondary meaning in the term "Honey Wheat" through its production of Honey Wheat bread. The applicant had a long history of use of the mark, as it had been marketing Honey Wheat bread continuously since at least 1936. *Flowers Indus.*, 5 U.S.P.Q.2d at 1581. Although recognizing that the applicant's use had been extensive, the TTAB also noted that "numerous third parties also use the designation 'HONEY WHEAT' (either alone or with other descriptive terminology) to describe a type of bread product." *Id.* at 1586. The TTAB found that "long and continuous use alone is insufficient to show secondary meaning where the use is not substantially exclusive." *Id.* at 1588–89. Accordingly, the TTAB held that the applicant had not established secondary meaning in "Honey Wheat," and refused registration of the mark. *Id.* at 1589.

Among the arguments raised by the applicant in *Flowers Industries* is that it used the term "Honey Wheat" as a trademark, while other producers used it descriptively. *Id.* KFI has raised the identical argument here, arguing that it is the only company that has used "kettle chips" as a trademark, while other producers have used "kettle" in a more descriptive manner. The TTAB found this argument flawed, noting that "purchasers who encounter the bread products of applicant, opposer, and others bearing the designa-

tion 'HONEY WHEAT' would regard the designation as nothing more than the descriptive name of a type of bread." *Id.* Similarly, consumers who encounter "Kettle Chips," "Kettle Classics," and the wide variety of other "kettle" products on the market will not associate the term "kettle" with KFI's products, but will merely view it as a designation for a type of chips.

KFI also points to the continuous presence of "Kettle Chips" on the potato chip market for nearly twenty-five years as support for its secondary meaning claim. However, KFI's use of the term "kettle" has never been substantially exclusive, even from the beginning, and the number and presence of competitors has only increased over the years. As noted above, CFI introduced evidence to show that no fewer than fifteen producers were using the term "kettle" in connection with their own potato chip products by the mid–1990s. "When the record shows that purchasers are confronted with more than one (let alone numerous) independent users of a term ... distinctiveness on which purchasers may rely is lacking." *Levi Strauss & Co. v. Genesco, Inc.*, 742 F.2d 1401, 1403 (Fed.Cir.1984). The abundance of competitors who use the term "kettle" in connection with their potato chips prevents KFI from proving secondary meaning. Accordingly, even if "kettle" and "kettle chips" were descriptive terms, rather than generic, they would still be ineligible for trademark protection. KFI cannot prove that "kettle" has become so associated with the "Kettle Chips" product that its primary function is to identify the source of the product.

## C. False Designation of Source

Even though "kettle" is a generic term for a type of potato chips, CFI nonetheless has an obligation to "identify its product lest it be mistaken for that of [KFI]." *Kellogg Co. v. Nat'l Biscuit Co.*, 305 U.S.

111, 120, 59 S.Ct. 109, 83 L.Ed. 73 (1938). In order to avoid consumer confusion and unfair competition, CFI is required to take "reasonable care to inform the public of the source of its product" and to sufficiently distinguish its product from KFI's. *Id.* at 119, 59 S.Ct. 109. KFI claims that CFI has not taken reasonable efforts to distinguish "Kettle Classics" from "Kettle Chips," and that there is a significant danger that "Kettle Classics" will be mistakenly identified as a product made by KFI. Accordingly, KFI requests injunctive relief designed to ensure that CFI is reasonably identified as the source of the "Kettle Classics."

KFI's request for injunctive relief on this ground is somewhat curious, given that earlier this year it came out with a complete redesign of the "Kettle Chips" package. To the extent that KFI claims the "Kettle Classics" package is confusing with the existing "Kettle Chips" package, it is actually CFI that actually has grounds to complain. The current presentation of "Kettle Classics" has been on the market for seven years, and was well known to KFI when the "Kettle Chips" redesign was initiated (the redesign came during the pendency of this litigation). Thus, any resulting confusion would be the fault of KFI. It cannot create grounds for injunctive relief by redesigning the "Kettle Chips" package to look confusingly similar to "Kettle Classics" and then expect this Court to order CFI to change its package. To the extent that KFI claims the "Kettle Classics" package is confusing with the prior "Kettle Chips" package, its claim is largely moot. Injunctive relief is forward looking only, *see Lidie v. State of California,* 478 F.2d 552, 556 (9th Cir.1973), and

the danger of source confusion is greatly diminished when the package that "Kettle Classics" is allegedly confused with is no longer on the market.

■■ Even considering the merits of KFI's claim, the Court finds that "Kettle Classics" is sufficiently distinct from "Kettle Chips" and the "Kettle Classics" package contains enough brand identifying information to properly identify its source as CFI. Essentially the only similarity between the marks and the packaging is the use of the term "Kettle." However, consumers see this term used on countless packages of potato chips on the market place, and recognize that it does not automatically denote KFI's product. "Kettle Classics" is not, in and of itself, so confusingly similar to "Kettle Chips" as to warrant injunctive relief. Moreover, CFI placed its "C f i" watermark in several locations on its bag, and a consumer who gives the package even a cursory inspection will be able to discern this watermark and recognize it as a source identifier.

Furthermore, the designs of the packages themselves are sufficiently distinct to eliminate confusion in the reasonable consumer.[16] Even Louis Blair, a consumer who testified on behalf of KFI, noted the difference between the two bags:

> **Well, it's completely different.** The material, the bag is different, the depiction of the potatoes is—I'd never seen it before. This big label "Natural" on the bottom. **It was entirely different.**

Louis Blair Tr. vol. 3, 32:14–17 (emphasis added). Mr. Healy also described the KFI packaging as inherently distinctive. He identified the woodcut font as the most

---

**16.** The identification of CFI as the producer of "Kettle Classics" may not be as prominent as KFI would like. However, the *Kellogg* requirement is that CFI take "reasonable care" to inform the public of the source of its product, not that it make all possible or plausible effort to do so. CFI's efforts to brand its product and identify its source are certainly reasonable.

distinctive feature of the "Kettle" logo. Healy Tr. vol. 2, 58:16–62:17. He described it as a "unique style that we created on our own," noting the seraphs on the capital letters, the placement of the letters (for example, the last E in "Kettle" is "nestled" into the L), and the overall "hand-crafted, old-fashioned image." Healy Tr. vol. 2, 59:12–62:10. "Kettle Classics" on the other hand, is printed in a much more ordinary block font that looks nothing like KFI's distinctive woodcut design. The material of the packaging is also very different. The bag used by "Kettle Chips" furthers the naturalistic imagery of the product, as it feels very much like a paper bag. "Kettle Classics," on the other hand, uses the metallic, foil-like material that is commonly found in potato chip packaging. CFI's bags of "Kettle Classics" contain large images in the middle of the bag that serve as flavor identifiers. These images look nothing like the woodcut image of the man stirring the kettle that was featured on "Kettle Chips" packages for over two decades. Also, the "Kettle Classics" bag is always purple in color, with only the image and the color of the border changing to denote different flavors. On "Kettle Chips" packages, the entire package changes color to reflect a different flavor. When all of these differences are considered, CFI has clearly taken sufficient steps, through its mark and packaging, to identify itself as the source of "Kettle Classics."

## IV. CONCLUSION

For all of the foregoing reasons, judgment is entered in favor of CFI.